UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

EDDIE L. CHEDVILLE                             CIVIL ACTION

VERSUS                                         NO. 10-47

MICHAEL J. ASTRUE, COMMISSIONER                HON. JAY C. ZAINEY
OF SOCIAL SECURITY ADMINISTRATION              MAG. JUDGE WILKINSON

## FINDINGS AND RECOMMENDATION

Plaintiff, Eddie L. Chedville, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B) of the Eastern District of Louisiana, to which this case was reassigned from the Middle District of Louisiana. Record Doc. No. 11. Plaintiff filed a timely memorandum of facts and law. Record Doc. No. 20. Defendant filed a timely opposition memorandum (although it was incorrectly titled "Memorandum in Support of Defendant's Motion for Summary Judgment"). Record Doc. No. 23.

## I.  PROCEDURAL HISTORY

Chedville filed an application for DIB on October 17, 2006, alleging disability since January 10, 2006, due to a prosthesis on his right leg, status post amputation below the right knee and pain in his low back and right knee.  (Tr. 72-76, 93).  After his application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 22, 2008.  (Tr. 21-41).  On December 9, 2008, the ALJ issued a decision denying plaintiff's application.  (Tr. 12-20).  After the Appeals Council denied review on November 20, 2009, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-3).

## II.  STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ erred by failing to address Chedville's argument and failing to hold that he meets the criteria of Listing 1.05(B) for presumptive disability.

B.   The ALJ erred by failing to address the opinions of plaintiff's treating physician and his prosthetist that he must recline at will.

C.   The ALJ erred by holding that plaintiff has the residual functional capacity to perform a modified range of sedentary work despite limitations in his ability to use his right hand.

D.   The ALJ erred by relying on the vocational expert's testimony that jobs are available that plaintiff can perform, including telephone operator, appointment clerk and escort driver.

III. ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1. Plaintiff has severe impairments consisting of amputation below the right knee and degenerative disc disease of the lumbar and cervical spine.

2. Chedville did not assert that he has, and he does not have, any impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

3. He has the residual functional capacity to perform a modified range of sedentary work, including the ability to lift and carry ten pounds occasionally and five pounds frequently and to push and pull these amounts of weight. He can sit for one hour at a time and for six hours in an eight-hour work day. He can stand and/or walk for two hours in an eight-hour day. He cannot perform any over-the-shoulder work.

4. Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

5. Chedville cannot perform his past relevant work as an equipment operator.

6. Considering his age, education, work experience and residual functional capacity, plaintiff could perform jobs that are available in significant numbers in the national economy, including telephone operator, appointment clerk and escort driver.

(Tr. 14-19).

IV.    ANALYSIS

    A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the

Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton,

209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that he is

unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2008).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

---

[1]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found
not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment,
he or she has no severe mental or physical impairment which would limit the ability to perform basic
work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period
of twelve months and is either included in a list of serious impairments in the regulations or is medically
equivalent to a listed impairment, he or she is considered disabled without consideration of vocational
evidence.  Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the
claimant has a severe impairment, the claimant's residual functional capacity and its effect on the

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history."  Martinez, 64 F.3d at 174.

---

claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.    Factual Background

Chedville testified that he was 48 years old, five feet eight inches tall and right-handed.  He said he weighed 150 pounds and his weight has remained steady.  He stated that he lives with his wife, who has a job.  (Tr. 24-25).  He testified that he receives about $1,700 per month in disability insurance payments and has received such payments for about 24 months.  He said he drives a truck with an automatic transmission.

Plaintiff stated that he completed the eighth grade and that he can read, write and do arithmetic to the extent that he knows whether he receives the correct change for a purchase.  (Tr. 25-26).  He testified that he never went to school for any specialized vocational training.  He stated that he worked on the river, loading ships and operating heavy equipment, for 25 years.  He said he stopped working in January 2006, then tried to work for his father at his golf cart store, but was unable to maintain that job.  (Tr. 26).

Chedville testified that he has a lot of problems with his leg, knee, back and neck, and has nerve problems in his right arm and hand.  (Tr. 27).  He stated that his right leg was amputated below the knee in November 1998 and that he continued to work after the amputation until pain in his back and leg made him stop working in January 2006.  He testified that he has been treated with pain medications and shots in his back.  He said his doctors had suggested that he could have surgery, but he was reluctant to have it because

he felt that, if anything went wrong, in combination with his amputation, he would be disabled completely.

Plaintiff testified that he can sit comfortably for about 20 minutes before he needs to adjust his leg and has to lie down to find a comfortable position for his back, which cramps if he sits for too long. (Tr. 28). He said he can walk and stand for 20 minutes and can comfortably lift 10 to 15 pounds. He stated that he could not work in an office, even if he could alternate sitting and standing at will, because of pain that keeps him from concentrating and makes him need to lie down during the day. He testified that he does not sleep well and is up and down all night because of pain.

Chedville said his doctors have not recommended a back brace, but have recommended pain medication, cortisone shots and maybe surgery, which he does not want. He stated that he has problems with the vertebrae in his neck and does not "want to be just all pinned up." (Tr. 29-30). He said the surgery option was for his lower back, not his neck. He testified that he does not see any doctor on a regular basis for his back, that he calls to refill his medications and that he sees his family doctor, Dr. Day, for any medication problems or other problems. He said he smokes two packs of cigarettes per day, although Dr. Day and other physicians have told him that smoking will not help his overall condition. (Tr. 30-31).

Plaintiff testified that he has no plans for the future because everything is so hard, even though he has tried his best. He said he worked hard to come back to work after his amputation. He stated that he worked mostly out of Baton Rouge and at Exxon when he worked on the river. He said his last job was in Reserve, Louisiana, loading and unloading ships at a cement plant. He stated that he operated large, heavy cranes and loaders, for which he did not need a license, and that he received all his training through the company. (Tr. 31).

Chedville said that Dr. Day prescribed Cymbalta[2] for depression. He stated that he had been badly burned in an accident at the plant in 2004 and that his depression started when he returned to work after his burns healed. He testified that he was depressed because he was always in pain, could not do the things that he used to do and could not keep up with the other workers as a result of pain. He said the medications he takes calm him down a little and help to prevent his back from locking up.

Plaintiff stated that, during a typical day, he tries to stay busy, moves around a little bit and spends time with his wife when she comes home. (Tr. 32). He said he has a workshop for his tools, but he cannot do anything with them and he just moves them around because he does not want to get rid of them. He testified that he occasionally

---

[2]Cymbalta (generic name: duloxetine hydrochloride) is indicated for the acute and maintenance treatment of major depressive disorder and for the acute treatment of generalized anxiety disorder. Physicians' Desk Reference 1873 (64th ed. 2010).

mows the grass with a riding mower, but he splits up the work so that he mows for 30 minutes one day and finishes in 30 minutes the next day. He stated that he has not done any maintenance on the mower and does not do any repair work in his shop. (Tr. 33).

Chedville said he fishes in a pond in his back yard, but has given up fishing from a boat because it is too hard to stay in a boat for any length of time. He stated that he had gone hunting once the previous year, but he has given up hunting. He testified that he has two acres of land and he raises 11 quails.

At this point in the hearing, the ALJ told plaintiff that he could stand if he was uncomfortable, and plaintiff responded that he would just unbuckle his prosthetic leg. (Tr. 34). Chedville said he has always had trouble with the prosthesis fitting his leg. He testified that he does not have sores or ulcers, but has trouble with the blood not coming back up from the stump. He said that he "ha[d] abrasions and stuff," but that they are not as bad now because he does not use the prosthetic except when he has to, such as to come to the hearing that day. He stated that he had to use it when he was working because he needed both feet to operate equipment and to walk around while on the job.

Plaintiff testified that he gets along with his wife. He said he does nothing socially and has no hobbies. (Tr. 35). He stated that he sees Dr. Day every six months and that no doctor has prescribed heat treatments for his back. He said he experiences irritation

on his thighs where they were burned in 2004. He said the skin is very tender there and he breaks out in painful rashes if he moves around too much. (Tr. 36-37).

Upon examination by his own attorney, Chedville said that Dr. Johnston treats him for his back and that he last saw Dr. Johnston around the beginning of the year. He stated that he does not see Dr. Johnston very often because his medical insurance had changed, so that it was cheaper for him to see Dr. Day and get his prescriptions there.

Plaintiff clarified that he has trouble wearing his prosthesis because the blood gets caught in one spot in his knee, does not flow out and causes terrible pain. (Tr. 38). He said he has to unbuckle the prosthesis every 20 to 30 minutes to let the blood start flowing again. He stated that he has painful lesions and rashes on his stump and that he has tried various lubricants, which no longer help. He said that, as his skin is getting older, it is wearing out and that lesions pop up quickly. He said he has had his current prosthesis for about four years.

Chedville testified that he has muscle spasms and pain in his lower back that occasionally radiates down his legs, more on the left than the right. (Tr. 38). He said he has pain on the right side of his lower neck, which radiates into his right arm and both wrists, and that his fingers get numb. He stated that his dominant, right hand hurts when he uses it and he occasionally has trouble holding things in either hand because of numbness. He said he has no problem with lifting his hands over his head, reaching out

in front or pushing and pulling.  He testified that he has trouble moving his hips from side to side and cannot turn his neck or move his head up and down as far as he used to. He stated that his doctors can turn his head farther than he can by himself.  (Tr. 39-40).

Plaintiff denied that he ever told one of his doctors that he walks for exercise.  He said he used to walk a lot as part of his job, but he only walks around his house now.  (Tr. 40).

C.    Vocational Expert Testimony

A vocational expert, Richard Corbin, testified at the hearing.  He stated that plaintiff's past relevant job as an equipment operator, in which he supervised several people at times, is classified as medium exertional work with a "specific vocational preparation" ("SVP") level of five.[3]  Corbin testified that plaintiff's last, unsuccessful work attempt as a maintenance worker in a golf cart shop is medium work with an SVP of two.[4]  (Tr. 41).

---

[3]"Specific vocational preparation" is defined in the Dictionary of Occupational Titles as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.". . .

> The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

Bray v. Comm'r, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009) (quoting Dictionary of Occupational Titles App. C, at 1009 (4th ed. 1991); SSR 00-4p, 2000 WL 1898704, at *3).

[4]An unskilled job with an SVP of two can be learned in a period of "[a]nything beyond short demonstration up to and including 1 month."  Semi-skilled work with an SVP of three can be learned in "[o]ver 1 month up to and including 3 months."  Skilled work with an SVP of five requires a learning

The ALJ posed a hypothetical of an individual with plaintiff's age, education and work experience who could lift and carry ten pounds occasionally and five pounds frequently; stand and/or walk a total of two hours in an eight-hour workday; sit for one hour continuously, then stand briefly before returning to sitting, for a total of six hours in an eight-hour workday; and never work overhead. Corbin responded that the hypothetical person could perform sedentary jobs, such as telephone operator with an SVP of three; appointment clerk, with an SVP of three; and escort driver, with an SVP of two. He testified that there are 85,700 telephone operator jobs in the national economy and 1,324 such jobs in the Louisiana state economy; 165,000 appointment clerk jobs in the national economy with 2,322 in Louisiana; and 130,000 escort driver jobs nationally with 1,360 in Louisiana. (Tr. 42). He stated that a person with pain and limitations which caused him to miss four to five days of work in a month would be unable to perform any job in the national economy. (Tr. 42-43).

Upon cross-examination by plaintiff's attorney, the vocational expert testified that the hypothetical person could not perform any job if he had to recline at will during the work day. (Tr. 43).

---

period of "[o]ver 6 months up to and including 1 year." <u>Dictionary of Occupational Titles</u> App. C, ¶ II (4th ed. rev. 1991), U.S. Dep't of Labor, Ofc. of Admin. Law Judges Law Library, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Dec. 8, 2010).

D.    <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 14-15, 18). I find the ALJ's summary of the medical evidence mostly correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below, and except for the significant error noted on pages 23-24 herein.

E.    <u>Plaintiff's Appeal</u>

    1.    <u>The ALJ erred at step three by failing to address the criteria of Listing 1.05(B) for presumptive disability.</u>

Chedville contends that the ALJ erred by failing to address his argument, and failing to hold at step three of the sequential evaluation, that he meets the criteria of Listing 1.05(B) for presumptive disability. The ALJ erroneously stated in his decision that plaintiff had <u>not</u> asserted that any of his impairments meets or equals a listed impairment (Tr. 16), when Chedville actually had argued in a pre-hearing memorandum dated October 21, 2008 that he meets Listing 1.05(B). (Tr. 137-42). Although the ALJ held that plaintiff did not have any impairment or combination of impairments that meets or medically equals a Listing, the ALJ did not mention Listing 1.05(B). Plaintiff argues that the ALJ's failure to address Listing 1.05(B) specifically is a reversible error. The Commissioner responds that Chedville was not prejudiced by the ALJ's failure in this

regard because substantial medical evidence establishes that plaintiff does not meet the Listing.

Whether an impairment or combination of impairments meets a Listing is a medical question that can be answered only by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990).

Listing 1.05(B) provides that a claimant is disabled by amputation of a lower extremity "with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.05(B). The Listing incorporates the definition of "inability to ambulate effectively" from Section 1.00(B)(2)(b), which states:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to

carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Id. § 1.00(B)(2)(b)(1), (2).

Chedville admittedly does not use any hand-held assistive device that limits the functioning of both upper extremities, so he does not meet the general definition of inability to ambulate effectively in Section 1.00(B)(2)(b)(1). Nonetheless, he argues that he has "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with [his] ability to independently initiate, sustain, or complete activities," which meets the requirements of Listing 1.05(B). He relies on the opinions of his treating orthopedist, F. Allen Johnston, M.D., and his prosthetist, Jay Tew, C.P.[5] on October 23 and September 4, 2007, respectively, which were expressed on preprinted checklist forms. (Tr. 182-83 [Tew]; Tr. 184-85 [Dr. Johnston]).[6]

One question on both forms was whether Chedville has "stump complications resulting in medical inability to use a prosthesis to ambulate effectively?" Tew checked "yes" in response to that question. In response to other questions, Tew indicated that

---

[5]According to the American Board for Certification in Orthotics, Prosthetics and Pedorthics, Inc., the initials "C.P." stand for certified prosthetist.
http://www.abcop.org/certification/OrthotistsProsthetists/Pages/Default.aspx (last visited Nov. 29, 2010).

[6]The two forms are slightly different. The form completed by Tew addresses only symptoms associated with plaintiff's amputated leg, while the form completed by Dr. Johnston addresses plaintiff's symptoms and functioning in his back, neck and right leg.

plaintiff cannot consistently ambulate effectively on a sustained basis without significant pain, experiences pain in the stump and right knee with protracted standing or walking, has developed a painful skin irritation on the stump and must adjust his prosthesis at least twice an hour for three to five minutes to relieve pressure on the stump, aerate the skin and present a fresh portion of the wrap to the irritated portion. Tew also stated that the adjustment requirement becomes more frequent as time passes. (Tr. 182).

Dr. Johnston checked "no" in response to the question whether Chedville has stump complications resulting in medical inability to use a prosthesis to ambulate effectively. However, like Tew, Dr. Johnston indicated that plaintiff cannot consistently ambulate effectively on a sustained basis without significant pain; experiences pain in the stump, right knee and right thigh with protracted standing or walking; and must adjust his prosthesis at least twice an hour for three to five minutes to relieve pressure on the stump, aerate the skin and present a fresh portion of the wrap to the irritated portion. Dr. Johnston agreed that the adjustment requirement becomes more frequent as time passes. (Tr. 184-85).

Additional evidence in the record supports these statements. On January 10, 2006, Chedville complained to Dr. Johnston of pain in the stump radiating up through the kneecap and into the right thigh, with redness in the stump and right knee. Dr. Johnston noted that plaintiff had some pressure areas over his patella and stump and some diffuse

areas of raised erythematous,[7] pruritic[8] lesions.  Dr. Johnson diagnosed "symptomatic

below the knee amputation" and recommended that plaintiff use crutches, rather than his

prosthesis, when at home.  (Tr. 157-58).

On January 5, 2007, plaintiff was examined by consultative examiner Stephen C.

Ayers, M.D., a physical medicine and family practitioner.  Chedville reported that he

experienced achy, constant, right leg pain, which was worse with movement, and had

"blisters occasionally occurring to the stump . . . from the use of the prosthesis," for

which he used a topical oil.  Dr. Ayers noted that Chedville had atrophy in his right leg

above and below the knee.  (Tr. 166-68).  In a Medical Assessment of Ability to Do

Work-Related Activities on the same date, Dr. Ayers opined that plaintiff could stand

and/or walk less than one hour without interruption and less than one to two hours total

in an eight-hour day.  (Tr. 172).

During the hearing in October 2008, the ALJ told Chedville that he could stand

if he was uncomfortable, and plaintiff responded that he would just unbuckle his

prosthesis.  (Tr. 34).  He testified that he has trouble wearing the prosthesis because the

blood gets caught in one spot in his knee, does not flow out and causes terrible pain.  (Tr.

38).  He said he has to unbuckle the prosthesis every 20 to 30 minutes to let the blood

---

[7]Erythema is redness of the skin produced by congestion of the capillaries.  Dorland's at 617.

[8]Pruritis is itching.  Id. at 1480.

start flowing again.  He stated that he has painful lesions and rashes on his stump and that he has tried various lubricants, which no longer help.  He said that his skin on the stump is wearing out and that lesions arise quickly.  (Tr. 39).

The ALJ's failure to address Listing 1.05(B) deprives this court of the opportunity to determine whether his step three finding is supported by substantial evidence. Chedville argued at the administrative level that he met the Listing.  He submitted medical evidence that the condition of his amputated leg might cause an inability to ambulate effectively, as defined by Listing 1.05(B).  However, the ALJ's decision did not mention Listing 1.05(B) and did not discuss any medical records in the context of Listing 1.05(B).  At step three, the ALJ cited only the opinion of the medical consultant, Charles Lee, M.D., who had reviewed plaintiff's medical records and had determined at the initial agency level that plaintiff did not meet any listing.  (Tr. 174-81).  Dr. Lee rendered his opinion on January 30, 2007 and thus did not take into account plaintiff's medical records after that date, including the checklist opinions of Dr. Johnston and Tew. The ALJ "provides no rationale for discounting" the opinions of Tew and Dr. Johnston in relation to the Listing.  Audler v. Astrue, 501 F.3d 446, 449 n.3 (5th Cir. 2007).

The ALJ "summarily concluded" that Chedville does not have an impairment that meets or medically equals a listed impairment.  Id. at 448.  "The ALJ did not identify the listed impairment for which [plaintiff's] symptoms fail to qualify, nor did [he] provide

19

any explanation as to how [he] reached the conclusion that [plaintiff's] symptoms are insufficiently severe to meet any listed impairment. Such a bare conclusion is beyond meaningful judicial review." Id. (quotation omitted).

Under "the explicit terms of" 42 U.S.C. § 405(b)(1), "the ALJ was required to discuss the evidence offered in support of [plaintiff's] claim for disability and to explain why [he] found [plaintiff] not to be disabled at" step three of the sequential evaluation. Id. "Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support [his] conclusion at this step and because [he] did not, we, as a reviewing court, simply cannot tell whether [his] decision is based on substantial evidence or not." Id. (quotation omitted). This error is not harmless because plaintiff's "substantial rights were affected by the ALJ's failure to set out the bases for [his] decision at step three." Id. at 449.

Plaintiff asks this court to hold, without remanding this matter to the Commissioner, that he is disabled under Listing 1.05(B). The court cannot find that Chedville meets the Listing, which does not contain specific, measurable, objective criteria, but incorporates a series of nonexclusive examples that amount to an "inability to ambulate effectively." The determination whether plaintiff meets this Listing requires a weighing of the evidence. The Commissioner must make that determination in the first

instance. Accordingly, this matter should be remanded to the Commissioner for a finding whether Chedville meets or medically equals Listing 1.05(B).

In the event that the presiding district judge does not accept my recommendation concerning the ALJ's step three findings, I will address plaintiff's next two assignments of error.

> 2.    The ALJ erred by failing to address the opinions of plaintiff's treating orthopedist and prosthetist that plaintiff must recline at will.

> 3.    The ALJ may have erred by holding that plaintiff has the residual functional capacity to perform a modified range of sedentary work despite limitations in plaintiff's ability to use his right hand, when considered in combination with his other impairments.

I consider Chedville's second and third assignments of error together, as they both relate to the ALJ's findings concerning plaintiff's residual functional capacity. At step four of the sequential evaluation, the ALJ found that plaintiff has the residual functional capacity to perform a modified range of sedentary work, including the abilities to lift and carry ten pounds occasionally and five pounds frequently, to push and pull these amounts of weight, to sit for one hour at a time, to sit for six hours total and to stand and/or walk for two hours in an eight-hour day, with no over-the-shoulder work. The ALJ further found that plaintiff could not perform any of his past relevant work as an equipment operator. At step five, based on vocational expert testimony, the ALJ held that Chedville

could perform other sedentary jobs that are available in the national economy, including telephone operator, appointment clerk and escort driver.

"Sedentary work" involves lifting no more than ten pounds at a time, occasionally lifting or carrying articles like docket files, ledgers and small tools, sitting for about six hours out of an eight-hour workday, and occasionally walking or standing. Holifield v. Astrue, No. 09-31125, 2010 WL 4560524, at *4 n.1 (5th Cir. Nov. 10, 2010) (citing 20 C.F.R. § 404.1567(a); Ripley v. Chater, 67 F.3d 552, 557 n.25 (5th Cir. 1995)).

> Although sedentary work "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." . . .
>> In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded.

Guzman v. Barnhart, 159 F. App'x 578, 581 (5th Cir. 2005) (quoting 20 C.F.R. § 404.1567(a) (2004); Social Security Ruling 96-9p, 1996 WL 374185, at *6 (July 2, 1996)).

Chedville argues that the ALJ erred at the fourth step by failing to address the opinions of plaintiff's treating orthopedist, Dr. Johnston, and his prosthetist, Tew, that he must recline at will. He also contends that the ALJ did not adequately consider

limitations in the use of plaintiff's right hand when assessing his residual functional capacity. I discuss these assertions of error below.

I note first, however, that the ALJ erred in stating Dr. Ayers's opinion concerning plaintiff's ability to stand and/or walk in determining plaintiff's residual functional capacity. The ALJ said that Dr. Ayers found that Chedville "could stand <u>more than</u> 1 to 2 hours in an 8 hour day," and the ALJ then found that plaintiff could stand and/or walk for two hours a day. (Tr. 18) (emphasis added). Dr. Ayers actually opined that Chedville could stand and/or walk for <u>less than one hour</u> without interruption and <u>less than one to two hours</u> total in an eight-hour day. (Tr. 172) (emphasis added).[9] The ALJ's error regarding Dr. Ayers's opinion about plaintiff's ability to stand and/or walk substantially prejudiced plaintiff because the correct opinion, if accepted by the ALJ and incorporated into his residual functional capacity assessment, may mean that Chedville does not have the capacity to perform even a modified range of sedentary work.

As to plaintiff's first argument, he relies on the "yes" responses of Tew and Dr. Johnston on the checklist forms, both indicating that on "[m]ost days, [Chedville] must

_____

[9]The ALJ also said that plaintiff reported to Dr. Ayers that his pain is relieved by sitting and worsened by too much movement. (Tr. 14). Dr. Ayers said that "the patient states that <u>this</u> pain is relieved by sitting and worsened by too much movement." (Tr. 166) (emphasis added). Dr. Ayers's report is not entirely clear, but his reference to <u>this</u> pain may have been referring <u>only</u> to plaintiff's right leg pain being relieved by sitting, rather than to the combination of his right shoulder, neck, right arm and right leg pain.

recline at will during the day for relief of pain." (Tr. 182 [Tew]; Tr. 185 [Dr. Johnston]).

Plaintiff contends that the record contains no contrary opinions and that the ALJ was required to, but did not, specifically discuss this limitation. He argues that the ALJ was bound to incorporate this uncontested limitation in his residual functional capacity assessment and that, as the vocational expert testified, a person with such a limitation could not maintain employment. As to his second argument, Chedville relies on Dr. Johnston's opinion on the same form that Chedville "experiences . . . numbness of several fingers of the right hand" upon "any significant use of his right arm" (Tr. 184) and on the finding of consultative examiner Dr. Ayers that plaintiff's abilities to reach, handle, push and pull are "affected by" his impairment. (Tr. 173).

I find that the ALJ erred by failing to discuss these opinions, as well as other statements in the record by Dr. Johnston, plaintiff's treating orthopedist, regarding the severity of plaintiff's neck and back symptoms and his inability to sit for prolonged periods. Dr. Johnston stated in his treatment notes on February 23, 2006 that Chedville "should . . . avoid prolonged sitting or standing without changing positions." (Tr. 155). At an August 17, 2006 visit, Dr. Johnston directed that plaintiff "is not to stand or sit for a continuous period of time." (Tr. 152). In his progress note on December 7, 2006, Dr. Johnston opined that plaintiff probably had a cervical disc in addition to his previously diagnosed lumbar disc herniation. Dr. Johnston stated that plaintiff had "tried to work

and was unable to do so.  He has significant limitations in his back due to the [lumbar] disc herniation and is <u>capable at best [of] sedentary duty.  However, prolonged sitting aggravates his back pain and really he is unable to do that as well</u>."  (Tr. 212) (emphasis added).

On September 17, 2007, Dr. Johnston noted that a recent MRI of plaintiff's cervical and lumbar spine revealed that plaintiff has "a right-sided C6-7 disc herniation with significant right-sided C6-7 neuroforaminal[10] stenosis"[11] and a left-sided disc herniation at L5-S1, unchanged since the previous lumbar MRI in February 2006.  (Tr. 208).  The new, confirmed diagnosis and objective findings of a cervical disc herniation with significant spinal stenosis appear to be more severe findings than the results of a cervical x-ray that was interpreted by Dr. Ayers on January 11, 2007 (Tr. 171), which was also the basis of Dr. Lee's Physical Residual Functional Capacity Assessment on January 30, 2007.  (Tr. 181).

Furthermore, in his October 23, 2007 checklist, Dr. Johnston checked "yes" in response to two questions about plaintiff's ability to sit:  whether Chedville experiences low back pain upon sitting for extended periods and whether he experiences cervical pain

---

[10]A foramen (pl. foramina) is a natural opening or passage, especially into or through a bone.  <u>Dorland's</u> at 696.

[11]Stenosis is an abnormal narrowing of a duct or canal.  <u>Id.</u> at 1698.

upon looking down for prolonged periods, such as to read, write or operate a computer keyboard.  (Tr. 184).  The last section of the checklist in Question Nos. 10 through 15 asks Dr. Johnston to opine, as to six different functional requirements, whether plaintiff has the "residual functional capacity to be a permanent, full-time employee in a position with the following daily requirements without exacerbating his condition or causing him significant pain."  Dr. Johnston checked "yes" to Question No. 13 that plaintiff can stand/walk two hours in an eight-hour day (Tr. 185), and the ALJ cited this finding in his decision.

On the other hand, Dr. Johnston checked neither "yes" nor "no" in response to the other five questions in that section.  Because he checked "yes" in response to only one of the six listed requirements, his five other blank responses can only be interpreted as indicating that Dr. Johnston did not believe that Chedville could perform those five options, which included in Question No. 14 the ability to sit for six hours in an eight-hour day.[12]  If Dr. Johnston indeed meant that plaintiff could not sit for six hours, it would be

---

[12]Question Nos. 10, 11, 12 and 15 posit even more onerous requirements: whether plaintiff can stand or walk six hours in an eight-hour day, can stand or walk two hours in an eight-hour day while lifting/carrying up to 20 pounds, can stand or walk two hours in an eight-hour day while lifting/carrying up to 10 pounds or can alternate standing and sitting for eight hours without walking about or reclining.  Dr. Johnston's choice to leave these blank while checking "yes" to Question No. 13, that plaintiff can stand/walk two hours in an eight-hour day, can only be interpreted as a rejection of those more onerous requirements.

Dr. Johnston similarly left blank responses to questions in prior sections of the form where he had checked "yes" to one question that was specifically paired with a second question that he left blank, again leading to the interpretation that the blank response must mean "no."  Thus, he checked "yes" to

consistent with his opinions in his progress notes that Chedville cannot sit for prolonged periods and cannot perform sedentary work.

It is established in the Fifth Circuit that "'[o]nce evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged.'" Loza, 219 F.3d at 396 (quoting Rivas v. Weinberger, 475 F.2d 255, 258 (5th Cir. 1973)).

The ALJ's failure to address these opinions substantially prejudiced plaintiff because the opinions, if accepted by the ALJ, may mean that plaintiff does not have the capacity to perform even a modified range of sedentary work. The ALJ must at least explain why he did not accord controlling weight to the opinions of Dr. Johnston, who is both a treating physician and the only specialist whose opinions are in the medical record.

> The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is

---

Question No. 5(a) that plaintiff experiences low back pain on sitting for extended periods, but checked neither "yes" nor "no" to Question No. 5(b) that plaintiff experiences pain in the cervical spine on sitting for extended periods. Dr. Johnston did the same as to Question Nos. 7(a) and 7(b), indicating "yes" that plaintiff experiences numbness of several fingers of the right hand on any significant use of his right arm, but leaving blank whether Chedville experiences cervical pain with any significant use of his right arm. (Tr. 184). Since Dr. Johnston clearly and consistently checked "yes" when he agreed with a statement on the form, he presumably meant that he did not agree when he left both the "yes" and "no" columns blank.

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. The opinion of a specialist generally is accorded greater weight than that of a non-specialist.

Newton, 209 F.3d at 455. Although "[t]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," id., good cause must be shown to assign little or no weight to the opinion of a treating physician. Id. at 455-56. The ALJ made no finding of good cause to discount Dr. Johnston's opinions. "The ALJ cannot reject a medical opinion without an explanation." Loza, 219 F.3d at 395. A failure to accord great weight to the uncontradicted, well supported medical reports of treating physicians is reversible error. Id.

In addition, Tew is a certified prosthetist, which "is a healthcare professional who is specifically educated and trained to manage comprehensive orthotic and/or prosthetic patient care. This includes patient assessment, formulation of a treatment plan, implementation of the treatment plan, follow-up and practice management."[13] A certified prosthetist is not an "acceptable medical source" pursuant to the Commissioner's regulations. 20 C.F.R. § 404.1513(a). While Tew is not qualified to render a medical opinion and his opinion therefore is not entitled to the significant weight usually

---

[13]American Board for Certification in Orthotics, Prosthetics and Pedorthics, Inc., http://www.abcop.org/certification/OrthotistsProsthetists/Pages/Default.aspx (last visited Jan. 4, 2011).

accorded to the opinion of a treating physician, <u>Weaver v. Astrue</u>, 353 F. App'x 151, 154-55 (10th Cir. 2009); <u>Porter v. Barnhart</u>, 200 F. App'x 317, 319 (5th Cir. 2006); <u>Roby v. Comm'r</u>, 48 F. App'x 532, 2002 WL 31205246, at *3 (6th Cir. 2002), his report may be used to show the severity of plaintiff's impairment and how it affects his ability to work. <u>Porter</u>, 200 F. App'x at 319 (citing 20 C.F.R. § 404.1513(d)); <u>Roby</u>, 2002 WL 31205246, at *3. The ALJ did not discuss Tew's responses and therefore did not explain what weight he accorded to the opinions, which are largely consistent with Dr. Johnston's opinions.

Appellate courts have held that checklist opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records, but reliance on such opinions is appropriate when they are supported by other substantial evidence. <u>See</u> <u>Larson v. Astrue</u>, 615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records. . . . Here, there is a long record of treatment by [the treating physician] that supports his notations on the form."); <u>Peck v. Barnhart</u>, 214 F. App'x 730, 738 (10th Cir. 2006) (The ALJ "provided legitimate reasons" for rejecting a doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" or justified by the doctor's treatment notes.); <u>Johnson v. Apfel</u>, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's

rejection of physician's check-box form when it was contradicted by evidence in the record); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (When form "reports are unaccompanied by thorough written reports, their reliability is suspect.").

In the instant case, the ALJ did not discuss Dr. Johnston's opinions in his checklist form and in his treatment notes that Chedville must recline at will during the day for relief of pain, experiences numbness of several fingers of the right hand upon any significant use of his right arm, cannot sit for prolonged periods and cannot do sedentary work. The ALJ also did not address Tew's opinions regarding plaintiff's inability to ambulate effectively, or Dr. Ayers's finding that plaintiff's ability to handle objects is "affected by" his impairment. See Social Security Ruling 96-9p, 1996 WL 374185, at *8 (July 2, 1996) ("Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity."). The ALJ's failure to provide any rationale for discounting any of these opinions is reversible error.

Finally, an individual's combined impairments can prohibit substantial gainful activity. 20 C.F.R. §§ 404.1523, 416.923; Loza, 219 F.3d at 399; Fraga v. Bowen, 810 F.2d 1296, 1305 (5th Cir. 1987); Owens v. Heckler, 770 F.2d 1276, 1282 (5th Cir. 1985). "The law of this Circuit requires consideration of the combined effect of impairments: The well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the disabling effect of each of the claimant's ailments and the

combined effect of all of these impairments." <u>Loza</u>, 219 F.3d at 399 (quotations omitted). The ALJ stated at step three of the sequential evaluation that Chedville does not have a combination of impairments that meets or medically equals one of the Listings, but the ALJ did not specifically address the cumulative effect of all of Chedville's impairments when assessing his residual functional capacity at step four. The ALJ's errors described above may have prevented him from adequately considering the combined effects of all of Chedville's impairments.

In light of these errors, the ALJ's opinion concerning plaintiff's residual functional capacity is not supported by substantial evidence. Given that finding, it is unnecessary to address plaintiff's final argument that the ALJ erred by relying on the vocational expert's testimony, which was based on the residual functional capacity found by the ALJ.

Accordingly, it is recommended that this matter be remanded to the Commissioner for additional findings.

<u>CONCLUSION</u>

If I were the factfinder in this matter, my review of the entire record would most likely lead me to find that, even if Chedville does not meet Listing 1.05(B), he is disabled by his combination of impairments. Although he was able to work for several years following his right leg amputation, it appears to me that his conditions worsened, leading

him to stop working, and that the combined effect of his impairments related to his amputated leg, lumbar disc herniation, cervical disc herniation and spinal stenosis preclude him from being able to perform sustained gainful activity even at the sedentary level. However, the weighing of the evidence and the resolution of any conflicts in the evidence is the province of the Commissioner in the first instance, not of the reviewing court.

This court does <u>not</u> suggest that plaintiff failed to receive a full and fair administrative consideration of his claim or that the ALJ must necessarily change the previously made findings concerning plaintiff's disability. The court is acutely aware that Congress intended that there be an end to the administrative handling of Social Security claims and that there are financial and time burdens placed on the Social Security Administration when claims are returned for further consideration. The court does not take lightly its authority to remand. However, after careful review of the entire administrative record, the court finds that the interests of justice would best be served by remanding this matter to the Commissioner for further proceedings consistent with this report and recommendation.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be REVERSED and that this matter be REMANDED for a finding whether Chedville meets or medically equals Listing 1.05(B).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[14]

New Orleans, Louisiana, this ___10th___ day of January, 2011.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[14]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.